# In the United States Court of Federal Claims

No. 15-872T
(Filed: July 31, 2018)
For Publication

```
**************************************
                                      *
MINDY P. NORMAN,                      *    Bank Secrecy Act, Trial, Civil penalty,
                                      *    Failure to file, Willfulness, Taxpayer,
              Plaintiff,              *    Tax return, Maximum, Regulation,
                                      *    Discretion, Supersede
       v.                             *
                                      *
THE UNITED STATES,                    *
                                      *
              Defendant.              *
                                      *
**************************************
```

*James O. Druker*, Kase & Druker, Garden City, N.Y., for Plaintiff.

*Jason Bergmann*, United States Department of Justice, Tax Division, Washington, D.C., with whom was *Blaine G. Saito*, Trial Attorney, for Defendant.

## OPINION AND ORDER

**DAMICH,** Senior Judge

      On October 29, 2013, Plaintiff, Mindy P. Norman ("Ms. Norman") was assessed a penalty under the Bank Secrecy Act by the Internal Revenue Service ("IRS") in the amount of $803,530.00. This penalty was assessed for a willful failure to file a Report of Foreign Bank and Financial Account ("FBAR") in connection to a Swiss bank account she had in 2007. On January 21, 2014, Ms. Norman contested the assessment with the IRS, and on July 6, 2015, the IRS office of appeals affirmed the penalty, finding that Ms. Norman willfully failed to file an FBAR.

      Ms. Norman paid the penalty in full, then filed the instant Complaint in this Court on August 13, 2015. On February 10, 2016, Defendant filed a motion to dismiss pursuant to Rule 12(b)(1) Rules of the U.S. Court of Federal Claims ("RCFC"), which was denied by Senior Judge Merow in a reported Opinion on April 11, 2016. On April 21, 2016, Defendant filed its Answer to the Complaint, and discovery began in June 2016 and proceeded for a period of nine months, concluding on March 10, 2017.

      On January 11, 2017, the case was reassigned to this Court. On November 9, 2017, Defendant filed a motion for summary judgment pursuant to RCFC 56, and Plaintiff responded

1

on February 7, 2018. This Court denied Defendant's motion for summary judgment,[1] holding that a determination of willfulness is fact specific, and depends upon circumstances and nuances. *See* Status Conf. Tr. 4:15-21.

The requirement to file an FBAR is found in 31 U.S.C. § 5314 ("§ 5314"). In order to determine whether Ms. Norman's violation of § 5314 was "willful," the Court scheduled a one day trial for May 10, 2018, to hear the testimony and observe the demeanor of two witnesses: Ms. Norman and one of her accountants, Barry Kay. Status Conf. Tr. 17:24-19:8. The three hour trial was held in Brooklyn, NY, with one witness, Ms. Norman.[2]

After trial, Plaintiff filed a letter on May 21, 2018, with a recently decided case, *United States v. Colliot*, 2018 U.S. Dist. LEXIS 83159 (W.D. Tex. 2018) ("Colliot"). The Court ordered Defendant to respond and comment on *Colliot*, and Defendant timely filed its response. Plaintiff requested leave to file a reply, and the Court denied this request by an Order on June 5, 2018. Plaintiff sent its reply to the Court in the form of a letter on June 11, 2018. This document was not added to the record, as it was sent in direct contravention of the Court's Order of June 5, 2018.

After considering the documents, hearing Ms. Norman's testimony, and observing her demeanor, the Court finds that Plaintiff Mindy P. Norman willfully failed to file an FBAR for 2007 in violation of § 5314, and that she was properly assessed a penalty in the amount of 50 percent of the balance of her unreported foreign account.

### I.     Statutory Framework

#### A.  Willful and Non-Willful Penalties Under the Bank Secrecy Act

In 1970, Congress enacted the Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114, as a response to "serious and widespread use of foreign financial facilities located in secrecy jurisdictions for the purpose of violating American law." H.R. Rep. No. 91-975 (1970) reprinted in 1970 U.S.C.C.A.N. 4394, 4395. Congress authorized the Treasury Secretary to prescribe regulations which would implement the Bank Secrecy Act. 31 U.S.C. § 5314(b). The Treasury Secretary then required citizens with an interest in or control over one or more foreign financial accounts with value above $10,000 at any time during that calendar year, to file an FBAR before June 30 of the following year. *See* § 5314(b); 31 C.F.R. § 103.27(c). To enforce this regulation, the IRS[3] may assess a "civil money penalty on any person who violates, or causes any violation of, any provision of § 5314," not to exceed $10,000. 31 U.S.C. § 5321(a)(5)(A).

Specific to the case at hand, for willful violations, § 5321(a)(5)(C) mandates that the

---

[1] With the Court's permission, Defendant filed its reply brief after the Court denied Defendant's motion for summary judgment. *See generally*, Def.'s Reply, ECF No. 33.

[2] Mr. Kay, the other scheduled witness, did not appear to testify.

[3] This power to assess penalties was allocated to the Treasury Secretary by statute, but delegated to the IRS by 31 C.F.R. 103.56(g). This regulation was then reorganized to a new chapter in 2011. *See* 31 C.F.R. §§ 1010.350(a), 1010.306(c).

maximum penalty "shall be increased to the greater of [] $100,000, or [] 50 percent of the amount determined under subparagraph (D) . . . ." *Id.* This amount, for a "violation involving a failure to report the existence of an account," is "the balance in the account at the time of the violation." 31 U.S.C § 5321(a)(5)(D)(ii).  In this case, Ms. Norman was penalized at 50 percent of her account's balance.

### B. Standard for Willfulness Under the Bank Secrecy Act

The term "willful" is not defined under the statute. *See generally*, 31 U.S.C. § 5321. However, the Bank Secrecy Act specifically defines penalties under § 5321 as "civil money penalties." § 5321(a)(5)(A).  Where, as here, "willfulness is a condition for civil liability," it is "generally taken [] to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133), quoted in *United States v. Williams*, 489 Fed. App'x. 655, 658 (4th Cir. 2012).  "While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68 (internal quotation omitted).

Specific to FBAR cases, willfulness in the context of violations of § 5321 "may be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information,' and it 'can be inferred from a conscious effort to avoid learning about reporting requirements." *Williams*, 489 Fed. App'x at 658 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991).

Additionally, "every federal court to have considered the issue has found the correct standard to be the one used in other civil contexts." *Bedrosian v. United States*, No. 2:15-cv-5853, 2017 U.S. Dist. LEXIS 154625 at *3 (E.D. Pa. 2017).  A person willfully violates section 5314 when she "either knowingly or recklessly fails to file an FBAR." *Id.*; *see also United States v. Bohanec*, 263 F. Supp. 3d 888-89 (C.D. Cal. 2016) ("[W]illfulness under 31 U.S.C. § 5321 includes reckless disregard of a statutory duty.").  It is therefore the Court's task to determine whether Ms. Norman knowingly or recklessly failed to file an FBAR in 2007.

### C. The Offshore Voluntary Disclosure Program

In 2009, in order to encourage disclosure of foreign accounts in exchange for leniency in the application of FBAR penalties, the IRS implemented the Offshore Voluntary Disclosure Program ("OVDP"). *See* Internal Revenue Service, *Voluntary Disclosure: Questions and Answers*, No. 3 (May 6, 2009, amended Jun. 24, 2009, Jul. 31, 2009, Aug. 25, 2009, Jan. 8, 2010), https://www.irs.gov/uac/voluntary-disclosure-questions-and-answers ("OVDP Q&A"). To apply to the OVDP, a taxpayer had to specifically inform the IRS of a desire to participate by letter or telephone.  OVDP Q&A Nos. 4, 50.  If the taxpayer qualified for participation in the OVDP, the taxpayer's FBAR penalties could be reduced to 20 percent (rather than 50 percent) of the account balance.  OVDP Q&A No. 12.  The IRS specifically noted that taxpayers electing to file a "quiet disclosure" "should be aware of the risk of being examined and potentially criminally prosecuted for all applicable years."  OVDP Q&A No. 10. A taxpayer makes a quiet

disclosure by filing amended tax returns and FBARs and paying related tax and interest for previously unreported offshore income, without otherwise notifying the IRS or admitting any culpability for violating § 5314. *See* OVDP Q&A No.10.

Rather than applying to the OVDP in 2009, Ms. Norman filed a "quiet disclosure" through her Swiss accountant, Mr. Kraft. Trial Tr. 9:13-16. Ms. Norman's quiet disclosure contained amended tax returns and FBARS for the years 2003-2008, but 2007 is the only year for which Ms. Norman was assessed the 50 percent penalty.

## II.   Trial Testimony and Discussion

Ms. Norman's theory at trial was that she did not willfully fail to file an FBAR. She testified that she learned of her duty to report her foreign bank account from her mother in 2009, Trial Tr. 27:20-23, and that she relied on her accountant, Stephen Kraft ("Mr. Kraft") to properly apply for the OVDP at that time.[4] Trial Tr. 27:25-28:25. However, Mr. Kraft only filed a quiet disclosure for Ms. Norman. Trial Tr. 9:13-16. As Ms. Norman did not provide further evidence to support her assertions, Trial Tr. 82:12-20, her theory depends on her memory alone. However, Ms. Norman's memory of nearly every other fact at issue was both uncertain and inconsistent with the evidence. For example, Ms. Norman testified that she did not remember:

Whether she opened the account or it was an inheritance, Trial Tr. 23:11-17;
Meeting with a UBS representative to open the account, 40:11-3;
Traveling to Zurich to open the account,[5] Trial Tr. 40:14-17;
When she opened the account, Trial Tr. 45:7-11;
Whether she withdrew $10,000 or $100,000, Trial Tr. 59:10-24; or
When she made that withdrawal. Trial Tr. 60:2-7.

Among many other facts which Ms. Norman did not recall, she also testified that she did not:

Recognize or know her UBS account number, Trial Tr. 48:1-2;
Know if UBS assigned her an account number at all, Trial Tr. 48:3-4;
Recognize documents opening and managing the accounts, Trial Tr. 49:4; 50:12;
Know what a numbered account was, Trial Tr. 48:16-21;
Recognize a stamped signature of her private banker. Trial Tr. 49:10-13;
Know what her signed note titled "Closing my UBS account" was. Trial Tr. 65:23;
Recognize Mr. Kraft's invoice for preparing the quiet disclosure, Trial Tr. 98:20.

Ms. Norman's inability to remember details of her financial transactions and tax preparation materials – other than the few details which help her case – strain credulity.

---

[4] Ms. Norman admitted that she only assumed that Mr. Kraft was applying to the OVDP for her, and that she did not read information about the OVDP that he sent her. Trial Tr. 27:25-28:25.

[5] Although Ms. Norman testified that she did not travel to open the account, Trial Tr. 40:17, numerous bank documents signed by Ms. Norman state that they were executed in Zurich. *See* Def. Ex 1-2, 2-1, 4-2, 11-1.

In addition to the uncertainty of Ms. Norman's testimony, her many admitted "inaccuracies" and "misstatements" – all of which would skew the facts in her favor if true – further impeach her credibility. Ms. Norman provided false and inconsistent statements in relation to her knowledge and control of her foreign account in: her 2007 income tax return, Trial Tr. 73:4-6; her IRS audit interview in 2012, Trial Tr. 74:14-18; her letter to the IRS from her accountant in 2012, Trial Tr. 75-77; her letter to the IRS from Mr. Druker in 2014, Trial Tr. 84:16-95:1; her Complaint in this action, which claimed that the account in question was actually owned by her mother, Pl.'s Compl. 2:12; and even her testimony at trial. *See, e.g.*, Trial Tr. 93:13.

Originally, on her 2007 tax return, Ms. Norman claimed not to have a foreign account. Trial Tr. 72:19-21. Then, in her IRS audit, she claimed that the account was never hers and she knew nothing about it until 2009. Trial Tr. 74:14-18. As more evidence came to light, however, she slowly amended and eroded her statements until she reached her current testimony: that she knew that the account and money was hers, and that she had met with bank representatives to manage it, and that she had withdrawn money, Trial Tr. 37:20-39:20, but she still "really didn't have, you know, control over it." Trial Tr. 93:13; *see also* Trial Tr. 86:21-94:2 (stating that the clause "none of the money in the account was mine," meant only that she "didn't make deposits.").

The Court cannot believe that this long string of "inaccurate" statements – to the IRS and to the Court, in tax documents, oral statements, letters, pleadings, and testimony at trial – is due entirely to happenstance, and is the fault of everyone involved but Ms. Norman. Because of her false statements and because her memory of every other issue is so uncertain, the Court does not find Ms. Norman's testimony credible, and the Court therefore cannot rely on her testimony, when she claims that she did not know of her duty to report her foreign income until 2009 and she tried to apply to the OVDP when she learned of it.

In contrast to Ms. Norman's questionable testimony, the evidence at trial was clear. Ms. Norman signed documents[6] to open a numbered bank account – which, by definition, concealed her income and financial information – with Union Bank Switzerland ("UBS") in 1999, as the only accountholder. Trial Tr. 43:12-50:2; *see also* Def. Exs. 1-4. Ms. Norman further concealed her financial information from U.S. authorities by signing to waive her right to invest in U.S. securities in 2000. Trial Tr. 50:14 (acknowledging her signature); Def. Ex. 5-1 ("I am aware of the new tax regulations.[7]"). Dieter Lutolf, a UBS representative, executed a similar agreement on Ms. Norman's behalf in 2003, Def. Ex. 6-1, five days after Ms. Norman had a phone call with

---

[6] These internal bank documents were supplied by UBS to the Internal Revenue Service in accordance with the Switzerland Tax Treaty. See UBS Certification of Business Records, Def. Ex. 46.

[7] The tax regulation referred to is the Qualified Intermediary Program – a program which, until October 2008, allowed foreign banks to promise to identify clients with U.S. Securities, and send the taxes due on those securities. *See* Rev. Proc. 2000-12, 2000-1 C.B. 387 (2000).

5

the bank, Def. Ex. 28-1, and again in 2005, Def. Ex. 6-2, two weeks after Ms. Norman had an in-person visit with a bank representative. Def. Ex. 28-1.

As further evidence of her intent to conceal her financial information, UBS' record of client contacts indicates that Ms. Norman was informed via telephone in 2008 of UBS' "New Business Model," and that she was "surprised and not pleased."[8] Def. Ex. 28-5. Under this new business model, UBS would be "working with the US Government to identify the names of US clients who may have engaged in tax fraud," and it would "no longer provide offshore banking." *UBS Statement of Mark Branson before the Permanent Subcommittee of Investigation*, BusinessWire (Jul. 18, 2008, 01:44 PM), https://www.businesswire.com/news/home/20080717 005967 /en/UBS-AG-UK-Regulatory-Announcement-UBS-Statement. Ms. Norman then closed her account with UBS and transferred her funds to Wegelein & Co.[9] one week before UBS publicly announced its new business plan. Def. Ex. 15-1.

In addition to concealing her financial information, Ms. Norman also failed to pursue knowledge of her reporting requirements. Ms. Norman claimed that she did not know of any details of the account, but the evidence clearly shows that she:

> Met yearly with her Swiss banker, Hans Thomann to discuss the account. Def. Ex. 28-1; *see also* Trial Tr. 58:2-21;
> Executed a waiver of her right to invest in U.S. securities. Trial Tr. 50:14;
> Executed management agreements in 2004, 2005, and 2006 with different choices of investment strategies. Def. Exs. 8, 9, 10;
> Complained to Dieter Lutolf about the performance of her account, and gave him instructions on how better to invest her funds. Def. Exs. 7, 28-1; Trial Tr. 61:1-62:8, 67:23-68:6; and
> Took out $100,000.00 from the account in 2002, Def. Ex. 28-1; Trial Tr. 68:7-11.

Although she may not be a "sophisticated individual in financial matters," Trial Tr. 108:13-16, the Court cannot believe that Ms. Norman, a schoolteacher of at least 7 subjects including economics and government over a 40 year career, Trial Tr. 20:1-17, could do all of this account management over the course of a decade for an account with a large sum of money in it, without once reading any documents, and without realizing that the account had tax implications.

Indeed, "[a]t a minimum," Ms. Norman was "put on inquiry notice of the FBAR requirement" when she signed her tax return for 2007,[10] but she chose not to seek more

---

[8] The words "not pleased" were illegible at Def. Ex. 28-2, so the Court looked to the copy of this document written in German at 28-5, translated the phrase, and cited to that entry.

[9] In 2013, Wegelin & Co. became the first foreign bank to ever plead guilty to tax law violations "for unlawfully helping U.S. taxpayers who had fled from UBS and other banks [to] hide their income and assets from the IRS." Press Release, U.S. Dep't of Justice, Swiss Bank Pleads Guilty in Manhattan Federal Court to Conspiracy to Evade Taxes (Jan. 3, 2013) (quotation omitted), https://www.justice.gov/usao-sdny/pr/swiss-bank-pleads-guilty-manhattan-federal-court-conspiracy-evade-taxes.

[10] Presumably, the same is true of each tax year since she opened the account in 1999, but

information about the reporting requirements.  *Williams*, 489 Fed. App'x at 659.  Although one of the few consistent pieces of Ms. Norman's testimony was that she did not read her tax return, Trial Tr. 36:1-7; 71:23-25, simply not reading the return does not shield Ms. Norman from the implications of its contents.  *See Williams*, 489 Fed. App'x at 659 (quoting *Greer v. Comm'r of Internal Revenue*, 595 F.3d 338, 347 n. 4 (6th Cir. 2010)); *United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000) (same).

The Court finds that Ms. Norman[11] acted to conceal her income and financial information, and also that she either recklessly or consciously avoided learning of her reporting requirements.  Therefore, the Court finds that Ms. Norman willfully violated § 5314.  *See Safeco*, 551 U.S. at 57.

### III.     Penalties Under 31 U.S.C. § 5321 Before and After 2004

After trial, Plaintiff submitted the decision in *Colliot* referred to above.  Letter, ECF. No. 36 at 1.  This decision of the U.S. District Court of the Western District of Texas held that a regulation, 31 C.F.R. 1010.820, under the previous version of the Bank Secrecy Act, which caps penalties under § 5321 at $100,000, was still valid.  Plaintiff requests that this court follow the holding in *Colliot*, and award her the difference between the penalty assessed and this "cap."  The Court will explain why, contrary to *Colliot*, the regulation for FBAR penalties set forth under the previous version of the Bank Secrecy Act is no longer valid, by examining the statute before 2004, the amendment made in 2004, and the holding in *Colliot*.

#### A.  The Text of § 5321 Before 2004

Prior to 2004, the Bank Secrecy Act allowed imposition of an FBAR penalty only for willful violations of § 5314.  31 U.S.C.S. § 5321(a)(5)(A) (2003) ("The Secretary of the Treasury *may* impose a civil money penalty on any person *who willfully violates* or any person *willfully causing any violation*. . . .") (emphasis added).  Congress capped this penalty by providing that "[t]he amount . . . shall not exceed" the greater of $25,000.00 or the balance of the account, limited to a maximum of $100,000.00.  31 U.S.C.S. § 5321(a)(5)(B) (2003).  The regulation guiding enforcement of this provision, 31 C.F.R. 103.57, directly paralleled this language and structure.  *See* 31 C.F.R. 1010.820.[12]

#### B.  The Text of § 5321 After the 2004 Amendment

The American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1418 (2004) ("AJCA") changed the structure of the FBAR penalty provisions, such that § 5321 now raises the maximum penalty for willful violations.  In addition, it gives the Treasury Secretary discretion to impose a penalty not just for willful violations, but for any violations. It now states,

---

2007 is the only tax year at issue in this case.

[11] Although the Court acknowledges the deference often due elder family members, the evidence in this case shows that, contrary to Ms. Norman's protestations, it was Ms. Norman, not her mother, who was in control of this account.

[12] 31 C.F.R. 103.57 was reorganized in 2010 to 31 C.F.R. 1010.820.

"the Secretary of the Treasury *may* impose a civil money penalty *on any person who violates,* or causes any violation of, any provision of section 5314." § 5321(a)(5)(A) (emphasis added). The statute then provides that the maximum penalty for a violation is usually $10,000. *See* § 5321(a)(5)(B)(i).

However, for willful violations, there is a new maximum penalty provided in § 5321(a)(5)(C). This section states: "the maximum penalty under subparagraph (B)(i) [$10,000] *shall* be increased to the greater of [] $ 100,000, or [] 50 percent" of the balance of the account. §5321(a)(5)(C)(i) (emphasis added). This provision, therefore, mandates that the maximum penalty allowable for willful failure to report a foreign bank account be set at a specific point: the greater of $100,000, or 50 percent of the account's balance. This text is unambiguous.

### C. Congress' Intent in Amending § 5321

In addition to the unambiguous language of the statute, Congress clearly stated its intent to raise the maximum amount of FBAR penalties when it passed the AJCA in 2004. Congress believed that "improving compliance with this reporting requirement is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams." S. Rep. No. 108-192 at 108 (2003). Therefore, Congress used the AJCA to "increase the [previous law's] penalty for willful behavior," and create an "additional civil penalty for a non-willful act." H.R. Rep 108-755 at 615 (2004) (Conf. Rep.). "Congress believed that increasing the [previous law's] penalty for willful non-compliance" would "improve the reporting of foreign financial accounts." Joint Committee on Taxation, *General Explanation of Tax Legislation Enacted in the 108th Congress*, JCS-5-05 at 387 (2005).

### D. The Reasoning in *Colliot*

In *Colliot*, the district court held that Congress' amendment to § 5321 in the AJCA did not supersede the regulation promulgated under the statute before amendment. The district court reasoned:

> [The amendment] sets a ceiling for penalties assessable for willful FBAR violations, but it does not set a floor. Instead, § 5321(a)(5) vests the Secretary of the Treasury with discretion to determine the amount of the penalty to be assessed so long as that penalty does not exceed the ceiling set by § 5321(a)(5)(C).

2018 U.S. Dist. LEXIS 83159 at *5-6 (citations omitted). It is true that the statute vested the Treasury Secretary with discretion to determine a penalty's amount. However, this statement mischaracterizes the language of § 5321(a)(5)(C), by ignoring the mandate created by the amendment in 2004.

Crucially, the amended statute dictates that the usual maximum penalty "*shall* be increased" to the greater of $100,000 or 50 percent of the account. § 5321(a)(5)(C)(i) (emphasis added). Congress used the imperative, "shall," rather than the permissive, "may." Therefore, the amendment did not merely allow for a higher "ceiling" on penalties while allowing the Treasury Secretary to regulate under that ceiling at his discretion. Rather, Congress raised the new ceiling

8

itself, and in so doing, removed the Treasury Secretary's discretion to regulate any other maximum.

There is no question whether Congress can supersede regulations, only whether Congress did supersede the regulation in this instance. In *United States v. Larionoff*, 431 U.S. 864, 873 (1977), the Supreme Court held, "in order to be valid[,] [regulations] must be consistent with the statute under which they are promulgated." *Id.*, *cited with approval in Colliot*, 2018 U.S. Dist. LEXIS 83159 at *5. The regulation in question, 31 C.F.R. 1010.820, which guided enforcement of § 5321 before its 2004 amendment, sets the maximum penalty for a willful violation of § 5314 to $100,000.00. However, because § 5321(a)(5)(C)(i) mandates that the maximum penalty be set to the greater of $100,000.00 or 50 percent of the balance of the account, the regulation is no longer consistent with the amended statute. Therefore, 31 C.F.R. 1010.820 is no longer valid. *See Larionoff*, 431 U.S. at 873.

Although the Court appreciates the district court's interpretation, this Court is not bound by that interpretation, and will not follow it.

### IV.     Conclusion

The Court finds that Ms. Norman's repeated and admitted lack of care in (1) filing inaccurate official tax documents without any review, (2) signing foreign banking documents without any review, and (3) later providing false sworn statements both to the IRS and to this Court, both with and without review, reaches the standard of reckless disregard for the law required to constitute a willful violation of § 5314. Contrary to Ms. Norman's new argument in light of *Colliot*, Congress clearly raised the maximum civil money penalty in § 5321 to the greater of $100,000.00 or one half of the balance of the account. As such, the Court holds that Ms. Norman willfully violated U.S.C. § 5314, and that the assessment of the civil money penalty under 31 U.S.C. § 5321 in the amount of 50 percent of her account's balance was appropriate. The Court therefore dismisses the case, and the Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

                                        s/ Edward J. Damich
                                        EDWARD J. DAMICH
                                        Senior Judge